**Mohammed Atique AHMED,
Appellant,[1]**

v.

**SHIMI VENTURES, L.P. and Beltway
Insurance Agency, Inc., Appellees.**

**No. 01–02–00914–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 31, 2003.

---

1. Mohammed Atique Ahmed and his wife, Farheen Ahmed, were both defendants below. However, only Mohammed Atique Ahmed filed a notice of interlocutory appeal, and appellees state in their brief that they nonsuited Farheen Ahmed during the pendency of this interlocutory appeal.

John H. Thomisee Jr., Houston, for Appellant.

John H. Sklar, Houston, for Appellee.

Panel consists of Justices TAFT, KEYES, and HIGLEY.

## OPINION

TIM TAFT, Justice.

Appellant, Mohammed Atique Ahmed, takes this interlocutory appeal from the granting of a temporary injunction. See TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon Supp.2003). We determine (1) whether the trial court could enter, and whether we may review in this interlocutory appeal, a modified temporary injunction order that was entered after Ahmed had appealed the original temporary injunction order; (2) whether we must vacate the injunction in part because it requires some acts violating the Insurance Code; and (3) whether the trial court abused its discretion in determining that appellees, Beltway Insurance Agency, Inc. ("Beltway") and Shimi Ventures, L.P. ("Shimi"), carried their burden of showing a probable right of recovery and irreparable injury. We modify the temporary injunction order in part, to vacate certain of its provisions, and affirm it as so modified.

## Background

The following background facts come from evidence presented at the temporary injunction hearing and from two affidavits, which the trial court considered without objection, that were attached to Beltway and Shimi's petition.[2]

**2.** Ahmed argues that we may not consider the affidavits because they are not evidence and because the parties did not agree to treat them as evidence. Ahmed is correct that, absent the parties' agreement, affidavits attached to pleadings and not admitted into evidence do not constitute evidence. See *Millwrights Local Union No. 2484 v. Rust Eng'g Co.*, 433 S.W.2d 683, 685–86 (Tex.1968) (holding that, absent parties' agreement, proof required for temporary injunction cannot be made by affidavit attached to injunction application); *Letson v. Barnes*, 979 S.W.2d 414, 417, 418–19 (Tex.App.-Amarillo 1998, pet. denied) (same). However, we disagree with Ahmed that we may not consider these affidavits under the circumstances present here. Here, the trial court announced during the hearing that it could base its decision on the exhibits and testimony from the hearing and also on "affidavits filed with the petition" and on "evidence [sic] provided in [Ahmed's] answer." No one objected to this stated procedure. The trial court was the fact finder; therefore, its declaring during the evidentiary hearing that it could consider the affidavits was tantamount to its having— rightly or wrongly—admitted those affidavits into evidence. Ahmed's counsel, who now argues that the affidavits did not constitute evidence, implicitly acquiesced in this procedure below when, after the trial court's quoted statement, he questioned his own client based on the affidavits attached to Beltway and Shimi's petition. *Cf. Millwrights*, 433 S.W.2d at 686 (holding that parties may agree to allow temporary injunction proof by affidavit). In any event, Ahmed cannot now complain about the trial court's having considered *these affidavits when, after having been ad-*

Beltway incorporated in October 2000 and is the managing general partner of Shimi, which was formed the same month. Shortly after Shimi's formation, Shimi purchased the assets, goodwill, and books of business of the Houston offices of Amco Insurance Agencies, Inc. ("Amco").

The undisputed evidence shows that, through the date of the temporary injunction hearing, Beltway had never been licensed as an insurance agency by the Texas Department of Insurance, even though Beltway's petition admitted that, since the purchase of Amco's business, Beltway had been "in the business of selling Texas personal automobile liability insurance." In contrast, Ahmed—originally the president, board member, employee, and shareholder of Beltway and also a limited partner in Shimi—had been a licensed, limited lines agent since 1999. There was testimony that Beltway had wanted Ahmed to get an insurance license in Beltway's name and that Ahmed could have obtained that license in as few as six weeks.

Starting sometime in late 2000, Ahmed began entering into producer agreements in his own name with insurers or their agents with whom Beltway did business. Ahmed received commission checks pursuant to these agreements. Through July 23, 2002, when he left Beltway, Ahmed endorsed his commission checks earned under any of these producer agreements to Beltway and deposited them in Beltway's account.

Ahmed signed one such producer agreement in early 2002 with Logic Underwriters, Inc. ("Logic"), an insurance agency with which Beltway did business. As with his other producer agreements, Ahmed signed the agreement in his own name, not expressly as agent of Beltway. Logic generally issued commission checks either in Ahmed's name or jointly in his and Beltway's name, showing Beltway's address under the payee line.[3] However, Logic mailed these checks to the addresses of Ahmed's personal stores, not to Beltway's address. Following the usual procedure, Ahmed endorsed the Logic commission checks to Beltway.

On July 23, 2002, Beltway's shareholders and board members met and removed Ahmed as a board member, president, and employee of Beltway. The board removed Ahmed because he had not obtained the licenses required for Beltway to act as a limited lines agency. According to Beltway and Shimi's evidence, Ahmed promised at that meeting not to interfere with Beltway's operations or relations with insurers after his removal. Nonetheless, Ahmed thereafter instructed Logic to issue commission checks solely in his name and to send them to him.

This dispute concerns who is entitled to the commission checks issued after Ahmed's removal for insurance policies that Ahmed wrote before his removal. In a nutshell, the parties dispute the capacity in which Ahmed acted under the producer

vised that the trial court would do so, Ahmed did not complain below. See TEX.R.APP. P. 33.1(a)(1); cf. Tigua Gen. Hosp., Inc. v. Feuerberg, 645 S.W.2d 575, 576 (Tex.App.-El Paso 1982, no writ) (treating affidavits as sufficient temporary injunction proof, despite lack of parties' agreement to do so below, when opposing party did not complain of deficiency of affidavits on appeal).

3. There were some exceptions. In June 2002, at Ahmed's request while he was out of town, Logic issued commission checks jointly to Ahmed and a company called BW Insurance Agency, Inc. ("BWI"). BWI was formed by Beltway's board of directors in March 2002. BWI had obtained assumed-name certificates to do business as "Beltway Insurance" and was actually operating Beltway's stores by the time of the temporary injunction hearing. It appears to be for these reasons, among others, that Ahmed requested that Logic issue the commission checks for June in his absence to BWI, rather than to Beltway.

agreements and, thus, the ownership of his commissions. Ahmed testified that he entered into the producer agreements on his own behalf, not as Beltway's agent; that the commissions earned pursuant to his producer agreements were his alone; and that the commission checks that he endorsed to Beltway were loans, although he admitted that no loan documents existed. Beltway and Shimi presented evidence that Ahmed acted as Beltway's agent under the producer agreements through July 23, 2002; that Ahmed knew that the commissions he earned on policies written before that date belonged to Beltway; and that no loan existed.

Shimi and Beltway sued Ahmed for fraud and conversion, seeking a temporary restraining order ("TRO") and temporary and permanent injunctions and damages.[4] The ancillary judge granted an ex parte TRO that restrained Ahmed, his wife, and those acting for or with them from "directly or indirectly removing, transferring, wiring, spending, investing, secreting, or . . . disposing" of funds belonging to Beltway and Shimi, whether from Logic or otherwise. The TRO also restrained the same people from contacting any insurers with whom Beltway and Shimi conducted business.

Ahmed answered, seeking to dissolve the TRO, counter-claiming for contract breach and conversion, and seeking a TRO and temporary and permanent injunctions against Beltway and Shimi. On August 19, 2002, the trial court held an evidentiary hearing on the applications for temporary injunction. The trial court orally granted Beltway and Shimi's application and denied Ahmed's.[5] On August 23 2002, the trial court signed a temporary injunction order, which provided in pertinent part as follows:

> IT IS THEREFORE ORDERED that Mohammed Atique Ahmed and all persons acting on behalf of or in concert with him, and all persons with actual notice of this Order, are temporarily enjoined from directly or indirectly removing, transferring, wiring, spending, investing, secreting, or in any manner whatsoever disposing of the commissions from Logic Underwriters, Inc. or the commissions paid by any insurer, or any other funds that belong to [Shimi] or [Beltway].

> IT IS FURTHER ORDERED that Mohammed Atique Ahmed *shall remit to [Beltway] the proceeds from all commission checks* that have been deposited to accounts under his control *for commissions earned on policies written through July 23, 2002* (approx.$47,325.00) from Logic Underwriters, Inc. or paid by any insurer with whom [Shimi] or [Beltway] conduct business and shall deliver such proceeds to [Shimi and Beltway's] counsel. . . .

> IT IS FURTHER ORDERED that Mohammed Atique Ahmed shall deliver to [Shimi and Beltway's] counsel a photocopy of each commission check that has been deposited to accounts under his control for commissions earned on policies written through July 23, 2002 from Logic Underwriters, Inc. or paid by any insurer with whom [Shimi] or [Beltway] conduct business and shall deliver such photocopies to [Shimi and Beltway's] counsel. . . .

---

**4.** Beltway and Shimi also pled conspiracy between Ahmed and his wife, Farheen Ahmed. However, during the appeal, Beltway and Shimi non-suited Ahmed's wife without prejudice, and they admit in their brief that the non-suit vitiates their conspiracy claim.

**5.** Ahmed does not complain on appeal of the denial of his temporary injunction application.

IT IS FURTHER ORDERED that Mohammed Atique Ahmed shall *endorse and make payable to the order of [Beltway] all checks* from Logic Underwriters, Inc. or paid by any insurer with whom [Shimi] or [Beltway] conduct business *for commissions earned on policies written through July 23, 2002* and shall deliver within forty-eight (48) hours after his receipt of all such checks to [Shimi and Beltway's] counsel.

IT IS FURTHER ORDERED that [Shimi and Beltway] and Mohammed Atique Ahmed shall photocopy each commission check that comes into their respective possession for commissions earned on policies written through July 23, 2002 from Logic Underwriters, Inc. or any other insurer with whom [Shimi] or [Beltway] conduct business and shall make such photocopies available to opposing counsel upon request.

IT IS FURTHER ORDERED that Mohammed Atique Ahmed, his family members, agents, servants, employees, attorneys and all other persons or entities in active concert or participation with him are enjoined from directly or indirectly contacting Logic Underwriters, Inc. or any insurer with whom [Shimi] or [Beltway] conduct business for any purpose related to insurance policies written or commissions earned on insurance policies written through July 23, 2002 and claiming that they represent the interests of [Shimi and Beltway].

(Emphasis added.)

Ahmed appealed the temporary injunction order three days later. He then left the country, reportedly to visit a sick family member. In September 2002, Beltway and Shimi moved to modify the temporary injunction order because Ahmed had allegedly failed to remit the commissions that he had already deposited (about $47,000), to endorse further commission checks to Beltway, and to provide Beltway and Shimi with copies of further commission checks. Beltway and Shimi claimed that Ahmed had not returned to the country. After holding a non-evidentiary hearing on the modification motion, the trial court entered a modified temporary injunction order, which was substantively similar to the first order except that it lowered Shimi and Beltway's bond and also ordered all insurers doing business with Shimi or Beltway to reissue any commission checks issued to Ahmed or Ahmed and Beltway jointly since August 2002, making them payable solely to Beltway, and to make all future commissions checks on policies written through July 23, 2002 payable solely to Beltway.

## Effect of Temporary Injunction's Modification After Perfection of Appeal

While this interlocutory appeal was pending, and after Ahmed had filed his brief, the trial court entered an order modifying the appealed temporary injunction order. Citing Rule of Appellate Procedure 29.6, Ahmed has moved this Court to review the modified temporary injunction order in this appeal. *See* Tex.R.App. P. 29.6.

The second temporary injunction order was entitled "order modifying temporary injunction," not "amended order," and it did not expressly vacate the first order. However, other than adding a provision applicable to insurers, reducing Beltway and Shimi's bond, and changing some compliance dates, the modified order was identical to the first order. Moreover, the modified order concerned exactly what the earlier order had, and it did not incorporate by reference any terms from the first order or state that it merely supplemented the first order—that is, the second order was a complete temporary injunction in itself concerning exactly the same subject matter. The modified order thus implicit-

ly superseded the earlier order.[6] *Cf. Anderson v. Teco Pipeline Co.*, 985 S.W.2d 559, 562 (Tex.App.-San Antonio 1998, pet. denied) (holding that later judgment, styled "amended final judgment," implicitly vacated earlier judgment, styled "final judgment").

Neither party questions whether we may consider the modified order in an interlocutory appeal from the superseded order, or whether the modified order is void in whole or in part, or whether the interlocutory appeal is somehow moot because it was taken from a now-superseded injunction order. We note, however, that these questions concern either our own jurisdiction over this appeal, which we must consider even if the parties do not,[7] or the trial court's jurisdiction to modify its injunction, which will affect which order we review, a matter we must decide anyway to review Ahmed's issues. Accordingly, we examine the effect of the modified order.

## A. Our Jurisdiction Over the Modified Temporary Injunction Order

Rule of Appellate Procedure 29.6 governs our jurisdiction to review, in an interlocutory appeal, a trial court order entered after the appeal's perfection:

> While an appeal from an interlocutory order is pending, on a party's motion or on the appellate court's own initiative, the appellate court may review the following: (1) *a further appealable interlocutory order concerning the same subject matter;* and (2) any interlocutory order that interferes with or impairs the effectiveness of the relief sought or that may be granted on appeal.

Tex.R.App. P. 29.6(a) (emphasis added).

The modified temporary injunction order clearly "concern[s] the same subject matter" as the earlier order that was appealed. *See* Tex.R.App. P. 29.6(a)(1). Therefore, we may review the modified order in this interlocutory appeal as long as it is itself an "appealable interlocutory order."[8] *See id.*

Generally, we have jurisdiction to hear an appeal from an interlocutory order only if a statute explicitly makes the order appealable. *See Stary v. DeBord,* 967 S.W.2d 352, 352–53 (Tex.1998). "A person may appeal from an interlocutory order of a district court ... that: ... grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction as provided by Chapter 65."[9] Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(4) (Vernon Supp.2003).

We must strictly construe section 51.014's grant of interlocutory jurisdiction because the Legislature intended it to be a narrow exception to the general rule that only final judgments are appealable. *See Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 355 (Tex.2001); *Baylor Coll. of Med. v. Tate,* 77 S.W.3d 467, 469–70 (Tex. App.-Houston [1st Dist.] 2002, no writ). An order *modifying* a temporary injunction order is not exactly an order that "grants or refuses a temporary injunction

---

6. We note that, even if the modified temporary injunction order had not supplanted the original order in its entirety, our disposition would have been the same for the reasons discussed below.

7. *See Brown v. Herman,* 852 S.W.2d 91, 93 (Tex.App.-Austin 1993, orig. proceeding) (holding that court of potential jurisdiction has jurisdiction to determine its jurisdiction).

8. For reasons discussed further below, only subsection (a)(1) of rule 29.6 concerns us here.

9. Tex. Civ. Prac. & Rem.Code Ann. §§ 65.001–.045 (Vernon 1997 & Supp.2003) (concerning injunctions).

or grants or overrules a motion to dissolve a temporary injunction." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4). Nonetheless, this Court has construed section 51.014(a)(4) to grant interlocutory review of an order modifying a temporary injunction, given the similarity of that order to the orders listed in section 51.014(a)(4). *See Toby Martin Oilfield Trucking, Inc. v. Martin*, 640 S.W.2d 352, 354–55 (Tex.App.-Houston [1st Dist.] 1982, no writ).[10] Allowing an interlocutory appeal of such an order is especially appropriate when, as here, the modified order implicitly vacates and then replaces the original one: that situation is very much like a dissolution, followed by a granting, over both of which rulings section 51.014(a)(4) expressly allows an interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4).

Consistent with *Martin*, we hold that we have jurisdiction to review an order modifying a temporary injunction by interlocutory appeal. *See Martin*, 640 S.W.2d at 354–55; *see also Currie v. Int'l Telecharge, Inc.*, 722 S.W.2d 471, 472–73 (Tex.App.-Dallas 1986, no writ). Accordingly, we further hold that we have jurisdiction to review the modified temporary injunction order in this interlocutory appeal from the now-superseded temporary injunction order. *See* TEX.R.APP. P. 29.6(a)(1).

We grant Ahmed's motion to review the modified temporary injunction order. *See id.*

## B. The Trial Court's Jurisdiction to Enter the Modified Temporary Injunction Order

That does not end our inquiry. Our holding that we may review the modified temporary injunction order in this interlocutory appeal is not the same as holding that the modified order itself is valid.

The modified order is valid if the trial court had jurisdiction to enter it during the interlocutory appeal. Rule of Appellate Procedure 29.5 sets out the trial court's jurisdiction after an interlocutory appeal is filed. *See* TEX.R.APP. P. 29.5. Rule 29.5 provides that, during the pendency of an interlocutory appeal, the trial court retains subject-matter jurisdiction of the case and may make "further orders, including one dissolving the order appealed from, and if permitted by law, may proceed with a trial on the merits." *Id.*[11] The rule expressly prohibits the trial court from making an order that is inconsistent with any temporary orders of the appellate court or that "interferes with or impairs" the appellate court's jurisdiction or the effectiveness of the relief that a party

---

**10.** *Accord Barrier v. Little*, No. 01–98–01361–CV, slip op. at 2, 1999 WL 439011 (Tex.App.-Houston [1st Dist.] June 17, 1999, no pet.) (not designated for publication) (quoting *Martin*); *Currie v. Int'l Telecharge, Inc.*, 722 S.W.2d 471, 472–73 (Tex.App.-Dallas 1986, no writ) (relying on *Martin*); *see Arrechea v. Plantowsky*, 705 S.W.2d 186, 187, 188–89 (Tex.App.-Houston [14th Dist.] 1985, no writ) (without discussing jurisdictional issue, reviewing by interlocutory appeal order modifying temporary injunction); *Pierce Mortuary Colls., Inc. v. Bjerke*, 841 S.W.2d 878, 880 (Tex.App.-Dallas 1992, writ denied) (in dicta, explaining why *Currie's* holding was correct for orders modifying temporary injunctions, but did not apply to amended class certifica-

tion order that expanded class). *But see Ludewig v. Houston Pipeline Co.*, 737 S.W.2d 15, 16 (Tex.App.-Corpus Christi 1987, no writ) (holding that order amending temporary injunction order was not appealable).

**11.** The trial court issued both temporary injunction orders before rule 29.5 was modified effective January 1, 2003. *See Order of the Supreme Court, Final Approval of Amendments to the Texas Rules of Appellate Procedure*, Misc. Docket No. 02–9237 (Dec. 23, 2002, eff.Jan.1, 2003). Because the 2003 amendment does not affect the disposition of this appeal, however, we quote the current version of the rule. *See id.*

seeks or that the appellate court may grant. Tex.R.App. P. 29.5(a), (b).

We have already held that we have interlocutory jurisdiction to review the modified order under statute and rule; therefore, the fact that the modified order implicitly supplanted the earlier, appealed order does not in itself interfere with our interlocutory jurisdiction in violation of rule 29.5. Additionally, to the extent that the modified order's content does not materially differ from that of the superseded order, the modified order neither prevents our review of Ahmed's issues nor affects the relief that he requests or that we could grant him. Finally, we note that the modified temporary injunction order's additional provisions do not adversely affect the relief that Ahmed requests or that we could grant him. Compare, e.g., McAllen Med. Ctr., Inc. v. Cortez, 66 S.W.3d 227, 238 (Tex.2001) (holding that severance order, entered after defendant appealed class-action certification, violated rule 29.5(b) because it severed out what had been the class-action claims against appealing defendant and because, although appellant could have intervened in severed suit, deadline for appealing class-certification order in that suit had already expired). Therefore, under the plain language of rule 29.5, the trial court had jurisdiction to enter the modified temporary injunction order.

There is case law that appears to be contrary, but because of amendments to the applicable rules, it does not control. For example, at common law, before the Supreme Court adopted the predecessor to these rules, some courts had held that the interlocutory appeal of an order deprived the trial court of jurisdiction over the subject matter of the appealed order, so that all subsequent trial court orders on the same subject were void. See Parsons v. Galveston County Employees Credit Union, 576 S.W.2d 99, 100 (Tex.Civ.App.-Houston [1st Dist.] 1978, order granting stay) (in vacating amended order entered after interlocutory appeal taken, holding, "The perfection of an appeal from an order granting a temporary injunction terminates the jurisdiction of the trial court insofar as the temporary injunction is concerned.").[12] Under the pre-rules common law, the modified temporary injunction order here would have been void, and only the original temporary injunction order would have remained in effect. See Humble Exploration Co. v. Fairway Land Co., 641 S.W.2d 934, 940 (Tex.App.-Dallas 1982, writ ref'd n.r.e.) (considering merits of original receivership order on interlocutory appeal, while vacating order modifying receivership after appeal for lack of jurisdiction in trial court).

But the Supreme Court's adoption of Rule of Civil Procedure 385b in 1983, and its adoption of substantively similar Rule of Appellate Procedure 43(d) in 1986, changed that common law rule. See Tex.R. Civ. P. 385b(d), Order of the Supreme Court, Adopting Rules of Civil Procedure (Dec. 5, 1983, eff.Apr.1, 1984), Texas Cases, 661–62 S.W.2d XXIX, XCIII (West 1984), superseded by Tex.R.App. P. 43(d), Order of the Supreme Court and the

---

**12.** Accord Boynton v. Brown, 164 S.W. 897, 897 (Tex.Civ.App.-San Antonio 1914, writ ref'd); Humble Exploration Co. v. Fairway Land Co., 641 S.W.2d 934, 936, 940 (Tex. App.-Dallas 1982, writ ref'd n.r.e.); Holst v. Newsletters, Inc., 578 S.W.2d 420, 421 (Tex. Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.); Caldwell v. Meyers, 446 S.W.2d 709, 710 (Tex.Civ.App.-Austin, orig.proceeding); City of Corpus Christi v. Lone Star Fish & Oyster Co., 335 S.W.2d 621, 622 (Tex.Civ. App.-San Antonio 1960, no writ); Hyatt v. Mercury Life & Health Co., 202 S.W.2d 325, 327 (Tex.Civ.App.-San Antonio 1947, orig. proceeding).

*Texas Court of Criminal Appeals, Promulgating New Rules of Appellate Procedure* (Apr. 10, 1986, eff. Sept. 1, 1986, superseded eff. Sept. 1, 1997), TEXAS CASES, 707–08 S.W.2d XXIX, LV (West 1986). Former rules 385b(d) and 43(d) provided that the trial court retained jurisdiction to "issue further orders, including dissolution of the order appealed from," but expressly prohibited orders "granting substantially the same relief as that granted by the order appealed from," those contrary to temporary appellate orders, or those interfering with or impairing the effectiveness of relief on appeal. *See id.* Under either former rule 385b(d) or former rule 43(d), the modified order would have been void for granting substantially the same relief as the original order, and we would have reviewed only the original temporary injunction order. *See St. Louis S.W. Ry. Co. v. Voluntary Purchasing Groups, Inc.,* 929 S.W.2d 25, 33 (Tex.App.-Texarkana 1996, no writ); *Cobb v. Thurmond,* 899 S.W.2d 18, 19 (Tex.App.-San Antonio 1995, writ denied); *Hopper v. Safeguard Bus. Sys., Inc.,* 787 S.W.2d 624, 626–27 (Tex.App.-San Antonio 1990, no writ).

Once again, however, the Supreme Court substantively amended the rules in 1997 by adopting rule 29.5, quoted above. *See Order of the Supreme Court and the Texas Court of Criminal Appeals, Final Approval of Revisions to the Texas Rules of Appellate Procedure* (Aug. 15, 1997, eff. Sept.1, 1997), TEXAS CASES, 948–49 S.W.2d LXI, C (West 1997). Importantly, the revision omitted the prohibition against entering an order granting substantially the same relief as that granted by the appealed order—which change was made, according to the comments, because the former prohibition was too broad. *See* TEX.R.APP. P. 29.5 & cmt. Therefore, the case law interpreting the "substantially similar" prohibition of former rules 43(d) and 385b(d) is not binding under rule 29.5. Neither is the pre-rules common law prohibition against any further orders viable under rule 29.5.[13]

We hold that the trial court had jurisdiction to enter the modified temporary injunction order. *See* TEX.R.APP. P. 29.6. We also hold that we may review that modified order in this interlocutory appeal. *See* TEX.R.APP. P. 29.5.

---

**13.** Only one case is to the contrary. In *Reeves v. City of Dallas,* after a temporary injunction order had been appealed, the trial court entered a second temporary injunction order (1) that expressly vacated the first injunction order and (2) that granted essentially the same relief as had the first. *See id.,* 68 S.W.3d 58, 60 (Tex.App.-Dallas 2001, pet. denied). Relying on rule 29.5's express grant of jurisdiction to dissolve an appealed temporary injunction, the *Reeves* court first held that the trial court had jurisdiction to enter the second temporary injunction order *to the extent that the second order vacated the first order,* further holding that the vacating of the first order rendered the appeal from the first order moot. *See id.* With this holding we do not necessarily disagree. The *Reeves* court also held that the remainder of the second temporary injunction order—which apparently added a trial date that the first order did not have (*see* TEX.R. CIV. P. 683, requiring temporary injunction order to set trial date)—interfered with its appellate jurisdiction and the relief that it could grant and so violated rule 29.5(b). *See Reeves,* 68 S.W.3d at 60. Neither do we disagree with this holding, and we distinguish *Reeves* on this basis. However, the *Reeves* court alternatively held that the trial court had no jurisdiction to enter the second temporary injunction order to the extent that it did anything but vacate the first order. *See id.* In this holding, the *Reeves* court relied solely on pre-rules authority— now superseded by rule—that the trial court loses jurisdiction completely over the merits of the injunction order once interlocutory appeal is perfected. *See id.* Because this holding of the *Reeves* court is based on superseded law, we respectfully disagree with it.

### The Merits of the Modified Temporary Injunction Order

#### A. Standard of Review and Burden of Proof

■ A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending trial. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). We may not review the merits of the applicant's case in an interlocutory appeal from a temporary injunction order. *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

■ To obtain a temporary injunction, an applicant must plead and prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. In establishing a probable right to the relief sought, the applicant need not establish that it will prevail at trial. *See City of Friendswood v. Registered Nurse Care Home*, 965 S.W.2d 705, 707 (Tex. App.-Houston [1st Dist.] 1998, no pet.). To establish an irreparable injury, the injured applicant must show that it "cannot be adequately compensated in damages or ... the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. That is, the applicant must establish that there is no adequate remedy at law for damages. *See Surko Enters., Inc. v. Borg–Warner Acceptance Corp.*, 782 S.W.2d 223, 225 (Tex. App.-Houston [1st Dist.] 1989, no writ). An adequate remedy at law is one that is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief. *Id.*

■ Whether to grant a temporary injunction lies within the trial court's sound discretion. *Tel. Equip. Network*, 80 S.W.3d at 607. We will thus not reverse the trial court's order unless the trial court's action was "so arbitrary that it exceeded the bounds of reasonable discretion." *Id.* One way that a trial court abuses its discretion is to apply the law erroneously to undisputed facts. *Id.* A trial court also abuses its discretion when it issues an injunction that orders an illegal act, even when done in the name of preserving the status quo. *See Registered Nurse Care Home*, 965 S.W.2d at 708 (vacating temporary injunction order granted in favor of plaintiffs/appellees because trial court abused discretion by issuing injunction that preserved status quo by allowing plaintiffs to continue operating facilities under conditions violating law); *see also DeNoie v. Bd. of Regents of Univ. of Tex. Sys.*, 609 S.W.2d 601, 603 (Tex.Civ.App.-Austin 1980, no writ) ("Status quo can never be a course of conduct which is a prima facie violation of law."). We view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor. *Amalgamated Acme Affiliates, Inc. v. Minton*, 33 S.W.3d 387, 392 (Tex.App.-Austin 2000, no pet.); *Tel. Equip. Network*, 80 S.W.3d at 607.

#### B. Violation of Law

##### 1. Whether the Modified Temporary Injunction Order Requires Acts Violating Statute

In issue four, Ahmed argues that the modified temporary injunction order is void to the extent that it compels him and third parties to violate the Insurance Code.

■ The Insurance Code prohibits an insurer or insurance agent engaged in the business of insurance in Texas from "pay[ing], directly or indirectly, ... any commission or other valuable consideration to ... any person for services performed by that person as an insurance agent in this state" unless the person holds an insurance license. TEX. INS.CODE ANN. art.

21.01–2, § 2A(b) (Vernon Supp.2003).[14] The Insurance Code also prohibits "any person to act, as an agent or otherwise, in soliciting or receiving applications for insurance of any kind whatever" in Texas and from "in any manner" aiding "in the transaction of the business of any insurance company" without "first procuring a license or certificate of authority. . . ." TEX. INS.CODE ANN. art. 21.01, § 2 (Vernon Supp.2003).[15] The Code defines an "agent" as

[a]ny person who solicits insurance on behalf of any insurance company, . . . or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, . . . or who shall receive or deliver a policy of insurance of any such company, or who shall . . . receive, or collect, or transmit any premium of insurance, . . . or do or perform any other act or thing in the making or consum-

mating of any contract of insurance for or with any such insurance company other than for himself, . . . whether any of such acts shall be done at the instance or request, or by the employment of such insurance company, or of, or by, any broker or other person. . . .

TEX. INS.CODE ANN. art. 21.02, § (a) (Vernon Supp.2003).[16]

The quoted prohibitions apply to persons licensed as, among other things, property and casualty insurance agents. *See* TEX. INS.CODE ANN. art. 21.01, § 3(16) (Vernon Supp.2003). The undisputed evidence showed that Ahmed was at all pertinent times such an agent, specifically, a licensed limited lines agent for automobile insurance.

The Insurance Code defines "person" for purposes of the above-quoted statutes to include corporations and partnerships. *See* TEX. INS.CODE ANN. art. 21.07, § 1A(8) (Vernon Supp.2003).[17] The Code further

---

**14.** The parties began their business arrangement before article 21.01–2, section 2A(b)'s effective date of September 1, 2001. *See* Act of May 18, 2001, 77th Leg., R.S., ch. 703, §§ 1.04, 10.01, 2001 Tex. Gen. Laws 1348, 1354, 1401 (now codified at TEX. INS.CODE ANN. art. 21.01–2, § 2A(b) (Vernon Supp.2003)). However, article 21.01–2A(b) merely recodified prior law (1) that was in effect at all times pertinent to this case and (2) that contained a prohibition not materially different in any way pertinent to this appeal from the prohibition in the current law. *See* Act of May 25, 1979, 66th Leg., R.S., ch. 404, § 1, 1979 Tex. Gen. Laws 884, 885 (eff. June 6, 1979) (first adding this prohibition to Insurance Code, prohibiting commission payment to unlicensed "person or corporation" for insurance-agent services), *amended by* Act of May 23, 1997, 75th Leg., R.S., ch. 596, § 1, 1997 Tex. Gen. Laws 2083, 2083–84, *recodified at current code section by* Act of May 18, 2001, 77th Leg., R.S., ch. 703, §§ 1.04, 1.09, 10.01, 2001 Tex. Gen. Laws 1348, 1354, 1357–58, 1401 (now codified at TEX. INS.CODE ANN. art. 21.01–2, § 2A(b) (Vernon Supp. 2003)). Accordingly, for simplicity's sake, we refer only to current statute.

**15.** Again, because the 2001 amendment to this statute did not change the preexisting law in any way material to this appeal, we refer only to the current statute. *See* (Act of 1951, 52nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 1061, *title heading added by* Act of April 23, 1999, 76th Leg., R.S., ch. 101, § 2, 1999 Tex. Gen. Laws 486, 534, *amended by* Act of May 18, 2001, 77th Leg., R.S., ch. 703, § 1.01, 2001 Tex. Gen. Laws 1348, 1349) (now codified at TEX. INS.CODE ANN. art. 21.01, § 2 (Vernon Supp.2003)).

**16.** The definition of an agent was substantively similar at all times pertinent to this appeal. *See* Act of 1951, 52nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 1061–62, *amended by* Act of May 13, 1985, 69th Leg., R.S., ch. 203, § 1, 1985 Tex. Gen. Laws 790, 790, *amended by* Act of May 18, 2001, 77th Leg., R.S., ch. 703, § 1.07, 2001 Tex. Gen. Laws 1348, 1357 (now codified at TEX. INS.CODE ANN. art. 21.02, § (a) (Vernon Supp.2003)).

**17.** At all times pertinent to this appeal, persons and corporations both were prohibited from sharing commissions and acting as an agent without a license. *See* Act of May 26,

defines a "corporation" to be "a legal entity that is organized under the business corporations laws or limited liability company laws of this state, another state, or a territory of the United States and that has as one of its purposes the authority to act as an insurance agent." TEX. INS.CODE ANN. art. 21.07, § 1A(3) (Vernon Supp. 2003). It was undisputed that Beltway was a Texas corporation and that, through the time of the temporary injunction hearing, Beltway was not a licensed insurance agency. Therefore, the statutes prohibiting commission-sharing and insurance solicitation applied to Beltway to the extent that it wrote insurance policies or otherwise acted as an insurance agent, which Beltway admitted here and below that it did.

The modified temporary injunction order requires Ahmed, a licensed insurance agent, to remit his commissions and to endorse his commission checks to Beltway, a corporation that is not a licensed insurance agency. The order also requires third-party insurers or their managing agents to make commission payments directly to Beltway, which again is unlicensed. The Insurance Code clearly prohibits such actions. The modified temporary injunction order thus requires illegal acts, even if the trial court merely intended to keep the status quo by ordering them.[18] *See Registered Nurse Care Home,* 965 S.W.2d at 708.

Beltway and Shimi do not argue that an unlicensed corporation performing insurance agent services can legally share a licensed agent's commissions. Rather, they respond that they never contracted to share Ahmed's commissions, but sought merely to preserve by the injunction the amount of revenues that would have flowed to Beltway had Ahmed obtained Beltway's license. That is, the protected funds represent the damages that Beltway and Shimi hope to collect under their fraud claim. However, that theory of the injunction's purpose has nothing to do with the fact that the mechanism that the injunction uses to carry out that purpose requires licensed agents and insurers to pay commissions directly to an unlicensed corporation performing insurance services, contrary to the law.

Accordingly, we must vacate those portions of the modified temporary injunction order that require Ahmed's commissions to be paid, directly or indirectly, to Beltway. *See Registered Nurse Care Home,* 965 S.W.2d at 708. We thus sustain issue four.[19]

1977, 65th Leg., R.S., ch. 579, § 2, 1977 Tex. Gen. Laws 1421, 1421–22 (adopting "person or corporation" language), *amended by* Act of May 25, 1979, 66th Leg., R.S., ch. 404, § 1, 1979 Tex. Gen. Laws 884, 884–85, *amended by* Act of May 23, 1997, 75th Leg., R.S., ch. 596, § 1, 1997 Tex. Gen. Laws 2083, 2083–84, *amended by* Act of May 18, 2001, 77th Leg., ch. 703, § 1.09, 2001 Tex. Gen. Laws 1357, 1357–58 (now codified at TEX. INS.CODE ANN. art. 21.07, § 1A(8) (Vernon Supp.2003)).

18. Sometime in the summer of 2002, BWI (not Beltway) obtained the license and registrations needed to act as a limited lines agency. Although BWI was actually operating Beltway's stores by the time of the temporary injunction hearing, the undisputed evidence showed that BWI and Beltway were separate corporate entities and that BWI was not Beltway's corporate successor. Moreover, the modified temporary injunction order did not order Ahmed's commissions paid to BWI, but to Beltway. BWI's relationship with Beltway, and the fact that BWI was licensed, are thus immaterial to our holding under issue four.

19. Our holding on this issue obviates the need to reach Ahmed's issue three, which argues that the trial court exceeded its jurisdiction in issuing the temporary injunction because the order to turn over and endorse all commission checks to Beltway (1) granted all the relief to which Beltway and Shimi would be entitled on final trial and (2) granted more relief than that for which Beltway and Shimi pled. Because our holding on issue four does not require vacating the entire modified temporary injunction order, our holding does not moot Ahmed's issue one (whether Beltway

## 2. Whether Beltway and Shimi Showed a Probable Right of Recovery

In issue one, Ahmed argues that Beltway and Shimi did not establish a probable right of recovery on their conversion or fraud claims because those claims were allegedly based on Ahmed's payment of commissions to them, an act that we have held would violate the Insurance Code. With respect to the fraud claim, Ahmed also argues that there was no evidence that he misrepresented anything.

■ Courts have long refused to enforce contracts that called for paying or sharing insurance commissions in violation of the Insurance Code provisions discussed above. *See Benefits Admin. Corp. v. Rearick*, 705 S.W.2d 234, 235–36 (Tex. App.-Texarkana 1986, no writ); *Perkins v. Lambert*, 325 S.W.2d 436, 440 (Tex.Civ. App.-Austin 1959, writ dism'd); *Stone v. Sterling Mut. Life Ins. Co.*, 127 S.W.2d 345, 347–48 (Tex.Civ.App.-Galveston 1939, no writ); *Employers Cas. Co. v. Mitchell, Gartner & Walton*, 84 S.W.2d 862, 864 (Tex.Civ.App.-Fort Worth 1935, no writ); *see also Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 681–82 (Tex.1998); *Tidelands Life Ins. Co. v. Armstrong*, 414 S.W.2d 196, 198 (Tex.Civ.App.-Austin 1967, no writ). Ahmed relies on this line of cases. However, Ahmed overlooks that at least one cause of action that Beltway and Shimi pled—that for fraud—does not seek to enforce an agreement to share commissions. To the contrary, as Beltway and Shimi explain on appeal, that cause of action assumes that Beltway *could not* legally share Ahmed's commissions. Instead, the cause of action relies on their allegation that Ahmed did not obtain Beltway's license after having been charged with doing so specifically so that he could keep the commissions from Beltway, allegedly contrary to the parties' arrangement.[20] That theory of recovery is not based on enforcement of an illegal arrangement to share commissions.

■ Fraud requires " 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.' " *Formosa Plastics Corp. USA v. Presidio Engs. & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex.1998) (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex.1994)). Ahmed relies on *Armstrong v. Tidelands Life Insurance Co.* to argue that no reliance existed as a matter of law. 466 S.W.2d 407 (Tex.Civ.App.-Corpus Christi 1971, no writ). The *Armstrong* court considered, among other things, summary judgments in favor of the defendant insurer on the contract-breach and fraud claims of an insurance agent. *See id.* at 408. The agent based his fraud claim on the insurer's having misrepresented that it would obtain the proper license for him to act as an agent. *See id.* The damages that the agent sought were the commissions that he would have received had the

and Shimi showed a probable right of recovery on their two claims), his issue two (whether Beltway and Shimi proved a probable, imminent, and irreparable injury), or his issue five (whether the trial court abused its discretion by allegedly relying on a finding of breach of fiduciary duty in granting the temporary injunction).

20. This theory of Beltway and Shimi's fraud cause of action was not precisely the theory

that they pled below. Rather, their petition alleged that Ahmed had committed fraud by allegedly falsely claiming that he would not interfere with Beltway's business after his removal. However, the fraud theory on which Beltway and Shimi rely on appeal was supported by the temporary-injunction evidence, when viewed in the light most favorable to the ruling, and Ahmed has not claimed surprise at the assertion of this theory on appeal.

insurer obtained the license. *See id.* at 409. After holding that the contract between the agent and the insurer was void and unenforceable because the agent was not properly licensed, the *Armstrong* court affirmed the summary judgment rendered on the fraud claim. *See id.* The court noted that the statute placed the responsibility on the agent to obtain the license *before* acting as an insurance agent. *See id.* Based on this statutory requirement, the *Armstrong* court held that the agent could not rely on the insurer's promise to get a license for him. *See id.* at 409–10, 411.

We distinguish *Armstrong* for two reasons. First, in *Armstrong,* it was the *insurance agent* who performed the services requiring a license, yet he relied on another entity first to obtain that license for him. Put another way, one party took responsibility for obtaining the insurance agent's license, while the other party took responsibility for acting as the insurance agent. Under that arrangement, the individual began acting as an insurance agent without having first confirmed that the insurer, a separate entity, had gotten the license that was a prerequisite to the individual's acting. Here, in contrast, viewed in the appropriate light and indulging all reasonable inferences in Beltway and Shimi's favor, one party (Ahmed) took responsibility *both* for obtaining the license, which the evidence shows might have been done quickly, *and* for earning the disputed commissions. Ahmed determined both when Beltway would be licensed and when he would start earning commissions on Beltway's behalf. The individual in *Armstrong* could not rely on another to obtain his license before acting as an agent, which arrangement might (and did) end up violating the statute; in contrast, nothing prevented Ahmed from procuring a license

for his corporation before acting as an agent.

Second, the individual in *Armstrong* relied on a separate entity to obtain his license. In contrast, viewed in the right light, Ahmed, as Beltway's president, was acting *as Beltway's officer and employee* for the purpose of obtaining Beltway's license. This means that Beltway (through its corporate representative, Ahmed) was *itself* taking responsibility for getting its own license before allowing Ahmed (as its employee) to earn commissions. The fact that Ahmed never got that license might show that Ahmed failed his corporate principal, but it does not necessarily demonstrate that Beltway was not entitled to rely on him as its own corporate officer. Therefore, *Armstrong* does not as a matter of law defeat the reliance needed for Beltway and Shimi's fraud claim.

Ahmed also argues that the trial court abused its discretion because there was no evidence that Ahmed had misrepresented anything. However, there was evidence that Ahmed had been charged with obtaining a license for Beltway and that he could have done so in as few as six weeks, but that he did not. The law prevented unlicensed Beltway from sharing Ahmed's commissions, yet Beltway still collected commissions. Additionally, Beltway did not remove Ahmed for failure to obtain Beltway's license until mid–2002, close to two years after he earned his first commissions. Viewed in the required light, these facts raise reasonable inferences that Ahmed hid his failure to get the license and that Beltway relied on that misrepresentation.

Accordingly, we hold that the trial court did not abuse its discretion if it concluded that Beltway and Shimi showed a probable right of recovery on at least their fraud cause of action.

We overrule issue one.[21]

21. Our holding on issue one moots Ahmed's issue five—whether the trial court abused its

discretion by allegedly relying on a finding of

## C. Irreparable Injury

In issue two, Ahmed argues that Beltway and Shimi presented no evidence that injury was imminent or irreparable or that Beltway and Shimi had no adequate legal remedy absent the temporary injunction.

■ The modified temporary injunction order recited that Ahmed's possession of commission checks would irreparably harm Beltway and Shimi by making them experience "an immediate, and if not addressed, ongoing, shortfall in operating revenues resulting in disruption of business operations, including the inability to provide insurance services to its customers." The order also recited that Beltway and Shimi had no adequate remedy at law to compensate them for these damages.

We hold that evidence supported the trial court's determination on both grounds. Regarding irreparable harm, Ahmed testified that, through July 23, 2002—that is, for over 20 months—he had deposited all his commission checks into Beltway's account. Ahmed testified that he had loaned these sums to Beltway to pay for Beltway's operating expenses: "I was trying to keep the money [sic] afloat. Without my loaning this money, *the company would have gone under and the investment my partners would have [sic] made would have physically vanished.*" (Emphasis added.) The temporary injunction hearing was held only 29 days after Ahmed had left Beltway and stopped depositing commissions into Beltway's account. Given Ahmed's own testimony that Beltway had depended on these sums for survival for almost two years, the trial court could reasonably have inferred that Beltway's needs had not changed substantially in 29 days.

Moreover, there was evidence from which the trial court could reasonably have

concluded that Beltway and Shimi had no adequate remedy at law. Ahmed admitted that, although he considered the commissions that he had earned since the beginning to be his personal property, he had not paid any income taxes on them to date. Ahmed's counterclaim alleged that the amount of commissions he had loaned to Beltway was $1,500,000 over the 22 months preceding the suit's filing; he also testified that, at least at the time of the hearing, his commissions were about $300,000 a year. One could thus reasonably infer that, under Ahmed's theory of the case, he could have potential, outstanding tax liability on a substantial income. Additionally, Ahmed testified that he no longer had errors and omissions coverage for himself individually, from which one could reasonably infer possible personal liability if Ahmed were sued. Finally, two days after the original temporary injunction hearing, Ahmed went to Pakistan. The next day, Ahmed's counsel filed a motion to extend the temporary injunction's deadlines, which motion attached a family member's affidavit estimating that Ahmed would return from Pakistan in three weeks. However, as of the date of the injunction-modification hearing held about two months later—and as was clear from counsels' discussion at that second hearing—Ahmed had not yet returned from Pakistan. The trial court thus knew of Ahmed's continued absence when it signed the modified temporary injunction order. That order carried forth the same inadequate-remedy recital that had appeared in the original order.

Based on this evidence, we hold that the trial court did not abuse its discretion in concluding that Beltway and Shimi would suffer irreparable harm and had no adequate remedy at law.

We overrule issue two.

breach of fiduciary duty in granting the temporary injunction: even if the trial court

erred in finding this, a claim for fraud does not require a breach of fiduciary duty.

## Conclusion

We modify the modified temporary injunction order by vacating those portions of that order that require Ahmed to relinquish or to sign over commissions to Beltway or that require licensed insurers or their agents to pay commissions directly to Beltway. We affirm the modified temporary injunction order as so modified.