**AFFIRMED and Opinion Filed May 14, 2024**



In the
**Court of Appeals
Fifth District of Texas at Dallas**

**No. 05-23-01255-CV**

**IN THE INTEREST OF K.G.F., A CHILD**

**On Appeal from the 304th Judicial District Court
Dallas County, Texas
Trial Court Cause No. JC-22-00269-W**

## MEMORANDUM OPINION
Before Justices Carlyle, Goldstein, and Breedlove
Opinion by Justice Carlyle

In this suit affecting the parent-child relationship, Mother and Father challenge the trial court's order terminating their parental rights to their child, who we refer to using the pseudonym, Kate. *See* TEX. R. APP. P. 9.8. We affirm in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

Father raises three points on appeal: (1) termination of his parental rights under Texas Family Code section 161.001(b)(1)(O) was improper because he was unable to comply with specific provisions of the court's order for reasons not within his control despite his good faith efforts; (2) the evidence is legally and factually insufficient to support termination under Texas Family Code section

161.001(b)(1)(E); and (3) the application of Texas Family Code section 263.401 denied him his rights to due process and due course of law.[1]

Mother argues in a single issue that the trial court erred because termination was not in Kate's best interests based on (1) Kate's desires, (2) the present and future emotional and physical danger to Kate, and (3) the parental abilities of the persons seeking custody.[2]

## Facts

### A. Posture

The Department received its first intake concerning Kate when she was one year old on November 15, 2021, and filed its original petition seeking termination of Mother and Father's parental rights on March 28, 2022. The court held its first hearing on April 7, 2022, and entered findings that it was contrary to Kate's welfare to remain in the home with Mother and Father. The court ordered Mother and Father to comply with the Department's family service plan on April 19, 2022. On July 12, 2022, the trial court entered findings that (1) neither Mother nor Father had demonstrated adequate and appropriate compliance with the service plan and (2) "no

---

[1]    While Father's brief states that one of the questions presented on appeal is whether trial courts may terminate parental rights when it is not in the child's best interests, there is no analysis of this issue, no relevant citations to the record, and no citation to any relevant authorities. Under the circumstances, Father has waived his challenge to the best interest finding. *See* TEX. R. APP. P. 38.1 (g), (i); *see also In re C.J.S.*, No. 05-22-01302-CV, 2024 WL 1596681, at *1 (Tex. App.—Dallas Apr. 11, 2024, no pet. h.).

[2]    Thus, the unchallenged predicate findings with respect to the termination of Mother's parental rights are binding. *In re J.W.*, No. 05-23-01049-CV, 2024 WL 1340367, at *3 (Tex. App.—Dallas Mar. 29, 2024, no pet. h.) (mem. op.).

visitation between [Kate] and [Mother] is permitted based on pending bond conditions in [Mother's] criminal case."

Although the original dismissal date was April 3, 2023, Father moved for an extension of time so that he could complete court-ordered services. On March 30, 2023, the court entered an order extending the dismissal date to October 2, 2023. *See* TEX. FAM. CODE § 263.401. The parties proceeded to trial on October 2, 2023. No party introduced any exhibits at trial.

## B. Affidavit in support of removal

The Department filed an affidavit in support of removal signed by Investigations Supervisor Craven. That affidavit states:

- "On 11/15/2021, the department received a Priority 2 intake alleging that there was a domestic violence incident that occurred between [Mother and Father]. The intake stated that [Mother] punched [Father] for throwing glass at her while the children were present. There was also a concern that the mother was using drugs because she was crying and emotionally unstable while she was being arrested."

- "On 2/3/2022, the department received a Priority 2 intake alleging that on 12/14/2021, [Mother and Father] engaged in a verbal argument and [Father] picked up [Kate] and attempted to go for a walk as a way to diffuse [sic] the situation. [Mother] would not allow [Father] to leave. [Father] was holding [Kate] and tried to get his phone to call 911. [Mother] snatched the phone out of his hand and hit [Kate] in the head by accident in the process. [Father] tried to walk away, and [Mother] tried to slap him but slapped [Kate] instead."

- "On 3/24/2022, the department received a Priority 2 intake alleging that on 3/24/2022, [Father] was admitted to Medical City Green Oaks due to pointing a gun to his head while on video with [Mother] and threatening to kill himself. Prior to [Father] doing this [Mother] sent texts to [Kate's] aunt of her slitting her wrist. [Father] put a gun up to

his head and told the aunt to take a picture. [Father] stated he wanted to show [Mother] how terrible it feels to have photos like these."

- "Between the dates of 12/14/2021 and 3/24/2022, the police have been called to [Mother and Father's] residence 7 times for domestic violence or mental health concerns."

- "Three of the seven incidents resulted in [Mother] being arrested due to being the aggressor. Two incidents resulted in [Mother] being transported to the hospital for mental health concerns due to her causing self-harm and one incident of [Father] being transported due to him causing self-harm."

- "On one of the incidents dated 1/6/2021, [Father] filled out an affidavit stating that [Mother] came home high on Methamphetamines [sic] and they argued about her using methamphetamines and him telling her that she needed to flush the drugs down to the toilet. He tried to leave with [Kate] and [Mother] and her friend grabbed [Kate] out of his arms and he left and called the police."

- "It was determined that [Kate] needed to be placed in foster care due to the on-going domestic violence, substance abuse concerns, mental health concerns, and there not being an appropriate caregiver to care for her at this time."

- Father told Craven that Mother had been arrested for violating "a protective order that stated that she was not to have contact with him or [Kate]."

- When Investigator Craven removed Kate, Father "stated that he understood that he and his wife brought this on themselves and he was willing to do whatever it took to get his daughter back."

## C. Family Service Plan

The Department filed a family service plan that the trial court adopted. In relevant part, this plan required Father to complete parenting classes, a Battering Intervention Prevention Program ["BIPP"], a psychiatric or psychological

–4–

evaluation, marriage counseling, random alcohol and drug testing, and a drug and alcohol assessment. The trial court also ordered Father to "remain drug and alcohol free throughout the case," to report to a drug and alcohol testing facility within 24 hours after receiving notification of the need to do so, and to follow any recommendations from service providers. Finally, Father received notification via the family service plan that failure to comply with court-ordered drug tests would constitute a presumptively positive result.

## D. Trial

### 1. Kristina Abbott

Kristina Abbott testified that:

- she was the Department's current caseworker with respect to Mother, Father, and Kate;

- the Department became involved due to multiple instances of domestic violence;

- Kate was struck during those instances;

- both parents were institutionalized for suicidal ideations;

- Mother was in jail for sixteen months during the pendency of the Department's case;

- Father completed only seven drug tests despite receiving notifications he needed to complete tests on 35 different occasions;

- the Department sought termination of Mother's rights based on her failure to complete services, her mental health, domestic violence, and the instability of housing; and

- the Department sought termination of Father's rights based on his failure to complete services, his drug tests, concerns about domestic violence, the lack of a support system, and the instability of housing.

### 2. Lakisha Murphy, CPS supervisor

The court also heard testimony from Lakisha Murphy, the initial CPS supervisor assigned to this case. Ms. Murphy testified that:

- she was the CPS supervisor on this case from April of 2022 until October or November of 2022.

- "[Kate] had speech issues. She was not able to stand and walk appropriately. She was not on target for her age[.]"

- "[T]here were a lot of milestones that had not been met, and that was very concerning . . ."

- Father refused to accept that Kate was not hitting developmental milestones.

- She "set up [Early Childhood Intervention] evaluation, and so with that ECI evaluation she [Kate] was recommended therapy, physical therapy, occupational therapy, and we [e]nsured that – the foster parent did a wonderful job with [e]nsuring that she started those services immediately . . . at first she didn't do well. She did a lot of crying and screaming as well as when – just taking a simple bath, she would do a lot of crying and screaming, but we eventually got her to the point where the therapist could actually work with her to get progress."

- The Department ensured that "services were provided, therapy services that helped her be on track, and now she's doing well."

- "[Father] was living in an apartment that – and it was the same apartment that [Mother] was arrested at. He was not able to pay his rent. He had been asking for assistance with paying his rent. As we tried to look for that assistance or for – you know, for him to have that service, he ended up getting evicted from the apartment, and by that time I was off the case, but then it is documented that he moved in with his mom, and he would never let anyone come and visit him at that home."

- "[I]n the beginning of the case there was a bond order where mom could not have contact with [Kate]. However, both parents still attempted to involve [Mother] in the visits against the order and against my advice, and they had to constantly be told not to put [Mother] on the visit virtually, just according to the court paperwork that we received, but they still continued to do so."

- "It was because it was the criminal case where the child had been injured, and that stipulation was put in place for a reason, and we were to follow that; however, they did not follow that as they were court ordered to."

- Father would not attend drug screenings and said it was due to his work.

- She provided Father with the opportunity to conduct drug screenings "up the street" after his meetings with her and would have selected places near his employer, "but he would never provide [her] the employer" so she could not do so.

- She requested Father's proof of employment monthly but never received it.

- She discussed the importance of Father's drug testing with him and how it could affect the outcome of the Department's case.

- "I do know when I was on the case I worked diligently with him to try to get him – I sent plenty of referrals and authorizations over for him to start psychological evaluation; however, he would never – he would schedule, but then I would receive information that he didn't show up."

- Father did not complete any services for eight months, despite some of them being offered virtually.

- During that time, Father would initiate scheduling for services, "but would never actually start the service."

### 3. Mother

Mother testified that she was convicted for felony assault on a public servant that occurred around April 20, 2021, and that, "it was at the police station while they were trying to release [her]." Mother admitted a criminal history of assaults, including another assault on a public servant in 2017, that she was diagnosed with borderline personality disorder in 2019, and that she abused methamphetamines for "a few days." When asked why the police came to their home on multiple occasions, Mother responded, "We would call the police on each other because we would be arguing and fighting, and so we would call them on each other." Mother also testified, "We were wrong. We were wrong in how we communicated with each other and how we talked to each other. It was unfair for our daughter to be in the middle of that[.]"

Mother said that her main support system lives in California and that she communicates with them via FaceTime and phone calls. When asked if she had a specific concrete plan with respect to babysitting, Mother responded:

> I plan to work when my husband is not working, and if we were to hire a babysitter, I would definitely look at my friends that I have grown up with because I do trust them, and they would be able to watch her just fine. If not, there are websites where you can find a babysitter who's been background checked, and that would be our third option.

She further acknowledged that she had not factored daycare into her budget and that Kate was currently in a good home with foster parents.

When asked to explain her long term goals for Kate and why the trial court should not terminate her rights, Mother responded:

She's my biological child, I love her more than anybody in this world ever can. As far as my goals for her, I would like to see her succeed. I'd like to put her in gymnastics and have her be an active child, you know, be ready for school, catch her up to where she needs to be. I would like her to hit her development growth points, and I want to see her happy. I want to make her happy. I want to give her a wonderful life, and . . . I know that I've made mistakes, but I don't feel like I deserve to lose my child over it.

### 4. Father

Father testified:

- "At the beginning of this, I went to take my first urine and hair follicle. When I got there, the facility told me that they didn't receive the paperwork on my hair follicle. When I got to my visit after that, I told . . . my caseworker, that if she hadn't received the paperwork – and then followed by that, in court, she said I refused to take the hair follicle; and then after that dishonest answer was there, I kind of just shut off. And between that and working and trying to keep the jobs that I was doing, it was just hard."

- "I don't have a sponsor because I wasn't recommended to go do anything outside of my IOP [Intensive Outpatient Program]."

- "There's never been a guarantee of when I was going to get off that day so, I mean, that was part of the reason, too, that it took so long for my IOP. I kept missing classes and kept having to start over on all my steps, but frequently I make 1,400 a week."

- "Prior to that, I didn't send in my employer information because it was hard for me to keep a job after this case started."

- "I did get an eviction because I got fired because I was making my visits. They wouldn't just let me off. I went to every visit I could, even if it meant losing my job because I knew it was more important to be there for my daughter."

- "I was in, like, a five-car pileup, and I woke up over the steering wheel. I actually – I fell asleep because I had been working 24 hours that day, and I dozed off. When I lifted my head up, a car swerved out from in

front of me where it was a two-lane road, and I didn't have time to strap my work truck, and so it gave something in my heart to where my legs swole up and my feet swole up where I couldn't walk."

- "I was just a selfish husband, you know. Like, I wanted – I wanted just things that she couldn't handle right then. That was my mistake on putting that stress on her."

### 5. Guardian ad litem

Kate's guardian ad litem testified that (1) Kate was in a good home, (2) he supported "some process that would allow [Mother and Father] to finish whatever services the Department deems necessary," and (3) the trial court had grounds to support the Department's position.

### 6. The trial court's findings and conclusion

The trial court found that neither Mother nor Father was credible and that their failures to complete court-ordered services were not reasonable. The trial court then entered an order terminating Mother and Father's parental rights to Kate.

## Analysis

A court may order termination of a parent–child relationship if the court finds by clear and convincing evidence that the parent committed one or more acts or omissions enumerated in section 161.001(b)(1) and that termination is in the child's best interest. *See* TEX. FAM. CODE §§ 101.007 (definition of "clear and convincing evidence"), 161.001(b)(1), (2); *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019).

We apply a standard of review that reflects the elevated, clear and convincing burden at trial, considering all the evidence to determine whether the factfinder could

reasonably form a firm belief or conviction that the Department of Family and Protective Services proved its grounds for termination. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002).

In this legal sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must assume the factfinder resolved disputed facts in favor of the finding. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id*. at 631.

The factual sufficiency review in these cases requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding. *Id*. Appellate courts consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id*. Thus, when reviewing findings pursuant to the clear and convincing burden, evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id*.

Because the fundamental liberty interest of parents in the care, custody, and control of their children is of constitutional dimension, we strictly scrutinize

involuntary parental termination. *See Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014).

### A. The evidence is legally and factually sufficient to support the trial court's finding that Father failed to establish good faith by a preponderance of the evidence.

"A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that: (1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent." TEX. FAM. CODE § 161.001(d); *In re P.H.*, No. 05-22-00617-CV, 2022 WL 17663648, at *9 (Tex. App.—Dallas Dec. 14, 2022, no pet.) (mem. op.). We review the record for legally and factually sufficient evidence to support the trial court's finding that Father failed to prove by a preponderance of the evidence that he made a good faith effort to comply with the court order and his failure to comply with the court order is not attributable to his own fault. *In re A.M.*, No. 01-22-00689-CV, 2023 WL 2483549, at *7 (Tex. App.— Houston [1st Dist.] Mar. 14, 2023, no pet.) (mem. op.).

Father first argues the trial court erroneously entered a May 20, 2023 order that required him to complete "a component of BIPP services" despite being the victim of Mother's domestic violence and that the trial court's rulings suggest "that the termination of his parental rights is partially predicated on his status as a victim

of family violence." We reject Father's contention that this order was confusing or erroneous, and note his failure to bring it to the trial court's attention despite the 19 months between the order and trial. Presenting this complaint to the trial court is a prerequisite to being able to present it to this court for appellate review, and thus we reject it. *See* TEX R. APP. P. 33.1(a)(1).

Father also suggests the trial court's order was confusing because it was at variance with a previous order. Father did not bring this alleged variance to the trial court's attention and has failed to preserve the issue for our review. *See id.* Assuming preservation and some variance between the two orders, the latter order implicitly superseded the earlier order, and we would reject this issue on its merits had it been preserved. *Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 687–88 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

Father further argues that the family service plan's lack of clarity with respect to his individual counseling caused him to complete individual therapy only to discover it did not count. Again, Father had approximately 19 months to complete services, he did not start them for at least eight months, and the trial court granted him an extension. Despite this, the record does not show that Father complained to the trial court that the family service plan lacked clarity and thus this issue presents nothing for our review. *See* TEX. R. APP. P. 31.1(a)(1).

Father's arguments also ignore the trial court's express finding that he was not credible and that his testimony was self-serving. *See In re J.F.-G.*, 627 S.W.3d 304,

312 (Tex. 2021) (factfinder is sole arbiter of witness credibility and demeanor). The trial court had complete discretion to disbelieve Father's testimony that he engaged in individual therapy that did not count, particularly given the absence of any supporting documentation or corroborating witnesses. *See In re J.F.C.*, 96 S.W.3d at 266 ("[A] court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.").

Father also relies on a single, recent negative drug test to support his good faith efforts to comply with the family service plan, but that does not overcome the twenty-eight presumptively positive tests over the course of these proceedings. The trial court found he was not credible, he admitted relapsing during the case, and Ms. Murphy testified she told Father his drug testing was important and could affect the outcome of the Department's case against him.

Additionally, uncontroverted evidence established that Father did not begin any services for at least eight months, that he would schedule services but not show up, and that he repeatedly refused to identify his employer to the Department, further frustrating the Department's efforts to facilitate accessible drug testing for him. This evidence supports the trial court's implicit finding that Father did not establish his good faith efforts to comply with the family service plan by a preponderance of the evidence.

Father points to injuries from a car accident that impacted his ability to comply with the family service plan. Again, there is no corroborating evidence in the record

–14–

and the trial court did not find him credible. The only evidence in the record that Father suffered any injury is (1) Father's testimony and (2) an unauthenticated and undated picture of two legs attached to Father's Amended Motion for Extension with the handwritten notation "immediate swelling of legs and feet due to car accident." *See* Tex. R. Evid. 901(a), 1004.

The record supports the trial court's finding that Father did not provide proof of his defense to noncompliance with his services plan by a preponderance of the evidence and is both legally and factually sufficient. Because Father did not otherwise challenge the legal or factual sufficiency of the evidence supporting the trial court's justification for terminating his parental rights under subsection O, we conclude the trial court's final order is supported by at least one predicate termination ground. *J.M. v. Dep't of Fam. & Protective Servs.*, No. 14-23-00352-CV, 2023 WL 7401417, at *8 (Tex. App.—Houston [14th Dist.] Nov. 9, 2023, no pet.) (mem. op.).

**B. The evidence is legally and factually sufficient to support the trial court's (E) finding.**

If a trial court terminates a parent's rights based on section 161.001(b)(1)(E) and the parent challenges that finding on appeal, due process requires the appellate court to review the finding and detail its analysis even if it affirms the termination order based on other section 161.001(b)(1) grounds. *In re C.W.*, 586 S.W.3d 405, 406 (Tex. 2019) (per curiam). The relevant inquiry under subsection (E) is whether evidence shows that the endangerment of the child's well-being was the direct result

of the parent's conduct, including acts, omissions, or failures to act. *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *6 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.). Termination under subsection (E) must be based on more than a single act or omission; there must be a voluntary, deliberate, and conscious course of conduct by the parent. *In re K.S.*, No. 05-15-01294-CV, 2016 WL 1613126, at *14 (Tex. App.—Dallas Apr. 21, 2016, pet. denied) (mem. op.). The offending conduct does not need to be directed at the child, nor must the child suffer an injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). But, under subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *In re J.T.*, No. 05-23-00826-CV, 2024 WL 339421, at *6 (Tex. App.—Dallas Jan. 30, 2024) (mem. op.). In determining whether a parent engaged in a course of "endangering" conduct, a trial court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *In re J.O.A.*, 283 S.W.3d at 345; *In re K.B.*, No. 05-19-00700-CV, 2019 WL 5485320, at *3 (Tex. App.—Dallas Oct. 25, 2019, no pet.) (mem. op.).

"A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *In re R.B.*, No. 05-21-00043-CV, 2021 WL 2943927, at *10 (Tex. App.—Dallas July 9, 2021, no pet.) (mem. op.). Here, Father's admission that he relapsed and used methamphetamines

during the pendency of these proceedings supports a finding that he engaged in multiple acts of illicit drug use, particularly given his 28 presumptively positive drug tests. The evidence also supports a finding that he engaged in conduct that endangered Kate's physical or emotional well-being. *In re E.S.S.*, No. 05-23-00031-CV, 2023 WL 4782682, at *8 (Tex. App.—Dallas July 27, 2023, pet. denied).

The record also reveals (1) a March 9, 2022 bond conditions order that prohibited Mother from directly or indirectly communicating with the alleged victim in her assault case and (2) uncontroverted testimony from Ms. Murphy that Kate and Father were the alleged victims. Despite this order and instructions to refrain from doing so, Father repeatedly involved Mother in his visits with Kate. Under the circumstances, this recurring violation of a court order constitutes evidence that Father endangered Kate's emotional well-being. *See In re T.N.R.*, No. 14-21-00473-CV, 2022 WL 370035, at *4–5 (Tex. App.—Houston [14th Dist.] Feb. 8, 2022, no pet.) (mem. op.) (concluding evidence was legally and factually sufficient to support termination under subsection (E) where the court heard, among other things, that (1) mother knew father had a history of domestic violence, (2) father had been violent with mother in front of her children, (3) father was a sex offender who "was not supposed to be around" mother's children, and (4) mother nonetheless continued to expose her child to father).

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder, not the appellate court, is the sole

arbiter of the witnesses' credibility and demeanor, we conclude that there was some evidence of endangerment on which a reasonable factfinder could have formed a firm belief or conviction of endangerment and reject Father's subsection (E) challenge. *See In re J.O.A.*, 283 S.W.3d at 346.

### C. The evidence is legally and factually sufficient to support the trial court's best-interest finding as to Mother.

A trial court's finding that termination is in a child's best interest is "not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re T.C.*, No. 05-19-00262-CV, 2019 WL 3852657, at *6 (Tex. App.—Dallas Aug. 16, 2019, pet. denied) (mem. op.). Rather, a best-interest finding "encompass[es] a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id*.

The familiar *Holley* factors guide our analysis with a focus on the best interest of the child, not the best interest of the parent, and they are not exhaustive. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). A best-interest finding need not be supported by evidence of every *Holley* factor. *See In re C.H.*, 89 S.W.3d at 27. Further, the same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied). Although there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently

placing the child in a safe environment is in the child's best interest. *Id.*; *see also* TEX. FAM. CODE § 153.131(b).

The second *Holley* factor, the child's current and future emotional and physical needs, is neutral because the evidence shows Kate is on target and that she no longer requires occupational therapy or physical therapy despite evidence she was initially developmentally delayed. There is also some evidence that Kate's previous needs were at least partially caused by Mother's actions. The third *Holley* factor, emotional and physical danger to the child now and in the future, weighs somewhat against Mother. Though Mother's actions were more in line with Kate's interests after her release from jail, the trial court could have concluded there was a risk Mother would relapse and return to the child-endangering and assaultive behaviors she exhibited that led to this proceeding.

The fourth *Holley* factor, the parental abilities of those seeking custody, weighs slightly against Mother. The evidence shows that Mother had positive interactions with the foster parent, that Mother had no concerns with the foster parent other than not trimming and cleaning Kate's fingernails, and that the foster parent "did a wonderful job" of ensuring that Kate started her therapeutic services immediately. While Mother counters that she has worked to improve herself and her parenting skills since her release from jail, this improved conduct in the short term does not conclusively negate the remainder of the evidence demonstrating her substandard parental abilities.

The sixth and seventh *Holley* factors, plans for the child and the proposed placement's stability, weigh slightly against Mother. The evidence at trial shows that the foster parents were "adoption motivated" and that Mother wanted to see Kate succeed and enroll her into gymnastics. Mother acknowledged that she had not yet factored daycare into her budget, but relayed plans to care for the child while she was not working. Mother was living in a hotel at the time of trial, and could only articulate a generalized plan to find a larger, more stable place for the family to live. Also, Mother conceded Kate was in a good home with the foster parents and the guardian ad litem corroborated this.

The eighth *Holley* factor, the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one, weighs strongly against Mother. These acts include abusing methamphetamine after giving birth to Kate, assaulting Kate, and then repeatedly violating a protective order designed to protect Kate in the ensuing criminal case. *See In re E.N.A.*, No. 11-14-00345-CV, 2015 WL 3799511, at *3 (Tex. App.—Eastland June 9, 2015, no pet.) (mem. op.). The ninth *Holley* factor, any excuse for the parent's acts or omissions, weighs against Mother as she offered no excuse for her criminal conduct against Father and Kate, but instead sought to minimize or deny the conduct.

On this record, we conclude the evidence is legally and factually sufficient to support a finding that terminating Mother's parental rights was in Kate's best interest.

**D. Father did not preserve his due process and due course of law argument.**

In his third issue, Father contends the trial court denied him due process and due course of law based on the deadlines set forth in Texas Family Code section 263.401. Father did not present this issue to the trial court and the issue thus presents nothing for our review. *See* TEX R. APP. P. 33.1(a)(1).

**Conclusion**

We conclude the evidence is legally and factually sufficient to support the trial court's (1) termination of Father's parental rights under Texas Family Code section 161.001(b)(1)(E), (2) finding that Father did not prove his good faith inability to comply with the family service plan via a preponderance of the evidence, and (3) finding that termination of Mother's rights was in Kate's best interest. We also conclude Father did not preserve his due process and due course of law arguments. Accordingly, we affirm the trial court's termination of Mother and Father's parental rights to Kate.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

231255F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF K.G.F., A CHILD, Appellant

No. 05-23-01255-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas Trial Court Cause No. JC-22-00269-W.
Opinion delivered by Justice Carlyle. Justices Goldstein and Breedlove participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered May 14, 2024