**Opinion issued November 21, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-22-00874-CV**

————————————

**MARK MAHER KREIT, Appellant**

**V.**

**PAULINE KREIT EL KHOURY, Appellee**

---

**On Appeal from the 310th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-15859**

---

# O P I N I O N

Appellant Mark Maher Kreit challenges the trial court's interlocutory order that appointed a receiver, appointed a forensic examiner, and awarded temporary spousal support in the ongoing divorce between Mark and appellee Pauline Kreit El Khoury. On appeal, Mark raises three issues regarding the appointment of the

receiver and one issue regarding the award of spousal support. We lack jurisdiction to consider an interlocutory appeal from an award of temporary spousal support. We conclude that the trial court did not abuse its discretion by appointing a receiver, and we therefore affirm the trial court's order.

## Background

### I.       Pauline files for divorce and seeks temporary orders.

After twelve years of marriage, in March 2022, stay-at-home-mother Pauline filed for divorce from Mark.[1] Ten days later, Mark filed a counterpetition for divorce. Alleging that Mark had transferred assets in which the community had an interest, Pauline sought temporary orders including appointment of a receiver. These assets included cash, real and personal property in the United States, Lebanon, and Syria, and Mark's business, ECR Clinic, P.A.[2] Mark argued that appointment of a receiver was inappropriate because some of the assets were his separate property. He also argued that the court should not appoint a receiver if another remedy exists. He asserted: "Plaintiffs have filed lis pendens on all the real property including those not owned by Dr. Kreit thereby protecting the public and

---

[1]     The couple have three minor children. Issues related to custody and child support are not part of this appeal.

[2]     Pauline also sought appointment of a forensic accountant, temporary spousal support, and interim attorney's fees. No statute authorizes our interlocutory appellate jurisdiction over the trial court's rulings on these requests, and they are not properly before us in this interlocutory appeal.

Mrs. Kreit until such time this Court finds that the property is community or separate property of Dr. Mark Kreit."

## II. The trial court holds an evidentiary hearing.

The trial court held an evidentiary hearing on Pauline's motion for temporary orders. The court allowed each side two hours for questioning at the hearing, which was conducted over two days in late October and early November 2022. The only witnesses were Mark, Pauline, and Pauline's attorney, Silvia Mintz, who testified about interim attorney's fees.

In her opening statement, Pauline's counsel asserted that Mark is a successful doctor who had transferred millions of dollars in assets to Syria and Lebanon. She also argued that Pauline has no control of the marital assets because Mark closed the joint bank account and cancelled the credit card. She informed the court that Mark had refused to answer discovery, and consequently, they did not know exactly where the money had gone. She also said:

> And the urgency of this hearing is because once the money gets to Syria and to Lebanon, it's going to be hard to get Dr. Kreit to follow the orders because so far he hasn't followed any orders. There were injunctions prior to me being in the case, on March, I think with the prior lawyer where it says no transfers of money, no sales of property, nothing. And Dr. Kreit kept on doing all of that.

### A. Mark testifies at the hearing.

Mark testified that he was 44 years old when he married then-25-year-old Pauline. He said that, before Pauline filed for divorce, he had listed his medical

3

practice, ECR Clinic, for sale because he had planned to move the family to Lebanon.

He testified about his and Pauline's domestic bank accounts. He identified the following domestic bank accounts:

1. Southside Bank (formerly First Bank and Trust) account for ECR Clinic, under Mark's control;
2. Chase Bank joint account in Mark's and Pauline's names, which he said he closed "because it was overdrafted";
3. Chase Bank account for ECR Clinic;
4. Chase Bank account for PMK Expo, LLC, a company Mark testified that he and Pauline founded in 2016; and
5. Chase Bank account in Mark's name only.

Mark also testified that he owned four houses, the clinic, and the land surrounding the clinic. Mark said that he gave one of his houses, 26902 Carriage Manor, to his brother Mounir in January 2022, but the deed was not recorded until March 2022. Mark asserted that Mounir had lived in the house for 20 years and that the transfer was intended to pay off the $744,000 balance of a debt that he had incurred to Mounir before his marriage to Pauline.

Mark testified that he also transferred a house at 26902 Armor Oaks to Mounir in January 2022, and the deed was recorded in March 2022. Mark later testified that he did not transfer that house to Mounir at all. He said he sold it to an investment company. Mark also testified that he transferred two tracts of land, 7.6 and 1.18 acres, respectively, to Mounir in March 2022.

4

Mark also testified about transactions beginning in the months before Pauline filed for divorce in March 2022. In November 2021, Mark gave Mounir $60,000. In January 2022, he made four additional cash transfers to Mounir: (1) $140,000 from the ECR Southside Bank account; (2) $20,000 from the Chase Bank joint account; (3) $40,000 from Mark's personal Chase Bank account; and (4) $75,000 from his Chase Bank ECR Clinic account. Mark also testified that in March 2022, he gave his sister, Shadia, who owned CK Pharmacy, a check for several thousand dollars, which he maintained was payment for supplies like covid and flu tests. In either October 2021 or March 2022, Mark gave another sister, Nadia, a total of $40,000, $20,000 in October 2021 and again in March 2022, for taking care of his mother. Mark testified that he received a PPP loan for $149,000, and he asserted that the money from the loan was shared with his brother Mounir and with Pauline.

Mark also testified about foreign investments including bank accounts in Switzerland and Lebanon and real estate and gold in Syria and Lebanon. At the time of the hearing, Mark said that he had $650,000 in an account at the Bank of Beirut and $128,000 in an account jointly owned with Pauline at Credit Libanais. He said that the bank operators had frozen these accounts. Mark said that he also had an account at Byblos Bank with a balance of $1.8 million, plus $20,000 for his use for an apartment. Mark testified that this money was his "premarital money."

Mark testified that in March 2022, there was $704,000 in his account at Pictet, a Swiss bank. Mark said that this amount was based on a prior investment in gold that had appreciated. Mark testified that he used that money to invest in a Syrian resort, though his testimony was inconsistent about whether he had made the investment in November 2021 or sometime after March 2022. Mark maintained that he told Pauline when he withdrew the $700,000 from Pictet. According to Mark, at the time of the hearing, the Pictet account was worth only $700. Mark testified that he owned about 20 properties in Syria and that he and Pauline owned some land in Lebanon.

Mark testified that before marriage, his net worth was $8.6 million, and he asserted that he had invested most of this amount in overseas properties during the marriage. He testified that, at the time of the hearing, he had $1.8 million in cash in a bank in Lebanon, but that money was frozen. He said that he had "about $41,000 in the bank, and I have a credit card that's due in a day of $50,000." He also said that he had spent a $300,000 line of credit to pay his attorneys in the United States and in Lebanon. Mark also testified that his business had suffered due to stress related to the divorce and about his ability to pay spousal support.

Mark testified that he was opposed to the appointment of a receiver because if a receiver were appointed, "the bank can call the notes immediately." He said: "No need for receiver. Will damage my practice, and I will be bankrupt."

## B.     Pauline testifies at the hearing.

Pauline testified that she moved from Lebanon to the United States to marry Mark about twelve years earlier. She said that she did not work outside the home after moving to the United States, and Mark provided for all their financial needs. During the marriage, she had access to a credit card and the joint bank account at Chase Bank, which she said she never used because she relied on the credit card. She testified that she was not previously aware of any other bank accounts.

Pauline testified that she filed for divorce and later moved out of the couple's home after finding 20 voice recorders hidden in the home between January and July 2022. She also testified that she twice found GPS trackers on her car that Mark had purchased on Amazon, and that Mark tracked her on a cellphone app. She also said that Mark's relatives were intrusive and had access to cameras and microphones that were inside the home. In addition, Pauline said that Mark had accused her of infidelity and questioned the paternity of their oldest child.

Pauline testified that, because some of the foreign bank accounts had been frozen, in June 2021, she travelled to Syria to transfer cash to the possession of her uncle, Michael Frayfur, who represents Mark in business transactions in Syria. In June 2021, Mark transferred a total of $300,000 to Frayfur with Pauline's in-person assistance.

Pauline testified that she was seeking appointment of both a forensic accountant and a receiver because she did not "have any control of the money and the assets" and because Mark had been "transferring assets to his brothers." She said that Mark was "transferring money outside and to Lebanon, to Syria, and I don't know anything about them, you know. . . . Since he's transferring properties here, he might be transferring properties overseas, also, you know." She later testified that Mark has control of all the assets, and that since she filed for divorce, Mark has been transferring assets outside the United States, and that she is concerned he will transfer all the assets to Syria. She testified that in the two months before the hearing, Mark had travelled to Lebanon and Syria.[3]

### III. The trial court appoints a receiver, and Mark appeals.

At the conclusion of the hearing, the trial court announced that it was appointing a receiver. On November 14, 2022, the trial court signed an order appointing a receiver, which stated: "The Court finds that the appointment of a Receiver is necessary to protect the community assets, Amy Lacy is appointed

---

[3] Pauline also testified that Mark had filed criminal charges against her in Lebanon, alleging that she had committed adultery, abused drugs, and stolen money from him. She testified about money she had received to be used to repair an apartment that she owned in Lebanon. She testified about professional certificates in her name that she acquired during the marriage, saying that Mark took the online classes in her name to obtain them. She testified that she owns an unimproved tract of land in Lebanon and that she does not have online access to bank accounts in Lebanon. She said she would have to go to Lebanon in person to access the money. Both Pauline and Mark testified that Pauline had about $123,000 in cash or gold being held for her in a safe at her mother's house.

Receiver in this matter." Mark timely filed a notice of appeal from this order. On February 8, 2023, the trial court signed a second order appointing a receiver. In this order, the trial court stated:

> After considering Petitioner, Pauline Kreit El Khoury's Motion to Appoint Receiver, the response, and arguments of counsel, the Court GRANTS the motion and finds that the appointment of receiver is necessary to preserve and protect the parties' property during the pendency of this case and that Amy Ngo Lacy is qualified to be appointed a receiver.

The court then identified the property subject to the receivership: (1) the marital estate of the parties; (2) three houses on Armor Oaks Drive in Kingwood, Texas; (3) one house on Carriage Manor Lane in Kingwood, Texas; (4) "any other real estate property owned by the parties either individually or as community property;" and (5) ECR Clinic, PA in Cleveland, Texas. The order established the duties of the receiver were to: (1) "determine the nature and extent of the assets and liabilities of the property"; (2) "manage, control, and preserve the property"; and (3) "sell if necessary." The powers of the receiver were specifically stated with reference to Chapter 64 of the Texas Civil Practice and Remedies Code. Mark timely filed an amended notice of appeal from this order.

The court also entered a temporary order awarding spousal support, which Mark challenges on appeal.

## Analysis

On appeal, Mark raises four issues. In his first and third issues, he challenges the trial court's appointment of a receiver with the power to control and sell separate property assets as erroneous and overly broad. In his second issue, he argues that the trial court did not explore the adequacy of other remedies to preserve and protect the marital assets. In his fourth issue, Mark challenges the trial court's award of $2,000 per month spousal support.

Before we address Mark's issues, we must determine what order or orders Mark has challenged in this appeal because he has filed two notices of appeal in this case. First, in November 2022, four days after the trial court signed the first order appointing a receiver and ordering the payment of spousal support, Mark filed a notice of appeal. This was timely because it was filed within 20 days of the court's order. *See* TEX. R. APP. P. 26.1(b) (establishing time for filing notice of accelerated appeal). About three months later, the trial court signed a second, more detailed order appointing a receiver and setting forth duties and rights of the receiver. In February 2023, Mark filed an "Amended Notice of Appeal." This document was filed seven days after the trial court signed the second receivership order and well within the time for filing an interlocutory appeal. *See id.*

In this case, the second receivership order did not incorporate by reference the earlier order or state that it merely supplemented it. While the February 2023

10

order appointing a receiver was consonant with the provision appointing a receiver in the November 2022 order, the February 2023 order was complete in itself on the subject matter of the appointment of a receiver. We conclude that the February 2023 order superseded the provisions of the November 2022 order that appointed a receiver. *See, e.g.*, *Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 688 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (holding that second order implicitly superseded earlier order because it was "a complete temporary injunction in itself concerning exactly the same subject matter"). However, the February 2023 order did not address attorney's fees or spousal support, which were included in the November 2023 order. Thus, the November 2022 order was not rendered entirely a nullity.

The Texas Rules of Appellate Procedure authorize the amendment of a notice of appeal to "correct[] a defect or omission in an earlier filed notice" of appeal. TEX. R. APP. P. 25.1(g). Here, the amended notice of appeal did not correct a defect or omission in the earlier filed notice of appeal, but it did provide notice of Mark's intent to appeal the February 2023 order. And it did so within the proper timeframe for seeking an interlocutory appeal. Accordingly, and considering the substance of the amended notice of appeal, we will consider it a second notice of appeal, which would, nevertheless, be docketed in the same cause number in our court. *See* TEX. R. APP. P. 12.2(c) ("*Multiple Notices of Appeal.* All notices of

11

appeal in the same case must be given the same docket number."). We therefore consider Mark's challenge to the award of spousal support as arising from the November 2022 order and his challenges to the order appointing a receiver as arising from the February 2023 order.

## I.  Spousal support order

Mark appeals the trial court's November 2022 temporary order requiring him to pay spousal support. Whether we have jurisdiction is a question of law that we consider de novo. *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 390 (Tex. 2020). "Unless a statute authorizes an interlocutory appeal, appellate courts generally only have jurisdiction over final judgments." *CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011). We strictly construe statutes authorizing interlocutory appeals because they "'are a narrow exception to the general rule' that 'appellate courts generally only have jurisdiction over final judgments.'" *Bonsmara Nat. Beef*, 603 S.W.3d at 390 (quoting *CMH Homes*, 340 S.W.3d at 447).

The Texas Family Code specifically precludes interlocutory appeal of temporary orders, except those appointing a receiver. *See* TEX. FAM. CODE §§ 6.507 ("An order under this subchapter [applying to temporary orders rendered in divorce suits], except an order appointing a receiver, is not subject to interlocutory appeal."), 105.001(e) ("Temporary orders rendered under this section

[applying to suits affecting the parent-child relationship] are not subject to interlocutory appeal."); *Dancy v. Daggett*, 815 S.W.2d 548, 549 (Tex. 1991) (per curiam) (holding that trial court's issuance of temporary orders in divorce case was not subject to interlocutory appeal).

We conclude that we lack jurisdiction to consider Mark's challenge to the spousal support temporary order. We overrule Mark's fourth issue.

## II. Receivership order

Mark challenges the trial court's receivership order in three issues. In his first issue, he argues that the trial court erred by appointing a receiver with power to take control and sell separate property assets. In his second issue, he argues that the trial court erred by appointing a receiver without exploring the adequacy of the other remedies to preserve and protect the marital assets. In his third issue, he argues that the trial court erred by granting the receiver "overbroad powers— including the right to control and, even sell, separate property assets."

### A. Our standard of review is abuse of discretion.

We review an order appointing a receiver in a divorce proceeding for an abuse of discretion. *Readhimer v. Readhimer*, 728 S.W.2d 872, 874 (Tex. App.— Houston [1st Dist.] 1987, no writ). To demonstrate an abuse of discretion, an appellant must show that the trial court acted arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Worford v. Stamper*, 801 S.W.2d 108,

109 (Tex. 1990); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). "A trial court abuses its discretion only if it reaches a decision so arbitrary and unreasonable that it amounts to a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law." *Howard v. Howard*, 490 S.W.3d 179, 184 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). When, as here, the trial court makes no separate findings of fact or conclusions of law, we draw every reasonable inference supported by the record in favor of the trial court's judgment. *Gainous v. Gainous*, 219 S.W.3d 97, 103 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "Abuse of discretion does not exist as long as there is some evidence of a substantive and probative character to support the decision." *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 578 (Tex. App.—Houston [1st Dist.] 1997, pet. denied).

**B.     Section 6.502 and our precedent provide the guiding principles for ordering a receivership in a divorce proceeding.**

When a divorce suit is pending, a trial court may render "an appropriate order . . . as deemed necessary and equitable" including "appointing a receiver for the preservation and protection of the property of the parties." TEX. FAM. CODE § 6.502(a)(5). "A receiver is not appointed for the benefit of the applicant, but to receive and preserve the property for the benefit of all parties interested therein." *Readhimer*, 728 S.W.2d at 873. Section 6.502 gives the district court broad but not "unbridled" discretion when making temporary orders. *Id.*; *see Norem v. Norem*,

105 S.W.3d 213, 216 (Tex. App.—Dallas 2003, no pet.). The court's discretion to enter temporary orders under section 6.502 is limited by the requirement for it "to act as necessary for the preservation and protection of the parties' property toward its goal of dividing the community property in a just and right manner." *Norem*, 105 S.W.3d at 216.

"Unlike receiverships authorized by the Civil Practice and Remedies Code, the Family Code does not set out the predicate necessary to support a receivership order." *Readhimer*, 728 S.W.2d at 873. *Compare* TEX. CIV. PRAC. & REM. CODE § 64.001(b) (providing that party seeking appointment of receiver "must have a probable interest in or right to the property or fund, and the property or fund must be in danger of being lost, removed, or materially injured"), *with* TEX. FAM. CODE § 6.502(a)(5) (authorizing appointment of a receiver for preservation and protection of property of parties). Some courts of appeals have held that a court may appoint a receiver upon a showing that the receivership is equitable and necessary for the preservation and protection of the marital estate, without proof that the property is in danger of being lost, removed, or materially injured or that a less harsh remedy is not available. *E.g.*, *Norem*, 105 S.W.3d at 216. But our Court has held that "the better rule . . . would require a showing that the parties' property was in danger and that a less harsh remedy was unavailable before a receiver is appointed." *Readhimer*, 728 S.W.2d at 873. To demonstrate the unavailability of a

less harsh remedy, the record must show "the options that the court could or did consider." *Id.*

## C. The trial court properly included alleged separate property in the receivership order.

Mark argues on appeal that the trial court was not authorized to place his separate property under the control of the receiver. We disagree. First, the order challenged on appeal is an interlocutory temporary order. There has not yet been a final determination, based on clear and convincing evidence, of what, if any, property is Mark's separate property. Second, Texas law does not "limit the receiver to community assets." *In re C.F.M.*, 360 S.W.3d 654, 659 (Tex. App.—Dallas 2012, no pet.).

In *C.F.M.*, the husband challenged an interlocutory temporary order in a divorce proceeding that put under receivership property that he contended was his separate property. *Id.* at 655. The Dallas Court of Appeals explained that the statute does not limit the trial court to imposing a receivership only on community property:

> Section 6.502 speaks to "the property of the parties." It does not employ the terms "separate property" or "community property," both of which are defined in the [F]amily [C]ode. Had the legislature intended to limit a receivership to community property, as Husband contends, it would certainly have used its defined term to do so. *See, e.g.*, TEX. FAM. CODE § 3.202(c) ("All community property is subject to tortious liability of either spouse incurred during marriage."); *id.* § 6.707(a) ("A transfer of real or personal community property or a debt incurred by a spouse while a suit for divorce or annulment is

pending that subjects the other spouse or the community property to liability is void with respect to the other spouse if the transfer was made or the debt incurred with the intent to injure the rights of the other spouse."). We will not impose a limitation on the funds available for a receivership when the legislature has not called for that limitation.

*Id.* at 659–60. The Dallas Court of Appeals concluded that "the trial court did not err in placing all property of the parties under the control of the receiver." *Id.* at 660. For the same reason, we conclude that the trial court did not abuse its discretion by placing all the property of the parties under the control of the receiver in this case. We overrule this issue.

## D. The record shows the less harsh options that the court could or did consider.

Mark argues on appeal that the trial court abused its discretion by failing to consider less harsh alternatives because there was no evidence adduced at the temporary orders hearing that he had violated a temporary injunction or that injunctive relief would be inadequate. We disagree because the record shows the less harsh options that the court could or did consider.

While our standard of review, under *Readhimer*, requires us to consider whether the record shows that the court considered less harsh options, it does not require that the court consider, specifically, the imposition of a temporary injunction. In the trial court, in response to the motion for appointment of a receiver, Mark argued that it was an unnecessary and harsh remedy considering the

17

availability of filing lis pendens on the real property, which Pauline had already done. Pauline's counsel argued that Mark had not responded to discovery requests or obeyed other court orders. Still, Mark nevertheless transferred vast amounts of assets to relatives and others domestically and outside the United States.

In its February 8, 2023 order, the trial court stated:

> After considering Petitioner, PAULINE KREIT EL KHOURY'S Motion to Appoint Receiver, the response, and arguments of counsel, the Court GRANTS the motion and finds that the appointment of a receiver is necessary to preserve and protect the parties' property during the pendency of this case . . . .

We therefore conclude that the trial court considered the less harsh alternatives raised by the parties as shown in the appellate record and that the court concluded a less harsh remedy would not protect the parties' property during the pendency of the case. *See Readhimer*, 728 S.W.2d at 873. We hold that the trial court did not abuse its discretion by appointing a receiver. *See id.* We overrule this issue.

**E.  Mark has not demonstrated that the powers granted to the receiver are overly broad.**

In his third issue, Mark asks: "Did the trial court err by granting the receiver overbroad powers—including the right to control and, even sell, separate property assets?" In his briefing on this issue, Mark focuses on the difference between separate and community property and the court's power with respect to each type of property. But he does not explain why the powers in the trial court's order,

18

specifically, are overly broad. We have already concluded that the Family Code authorizes a trial court to enter an order pertaining to all the parties' property in a divorce proceeding. To the extent that this issue is a recapitulation of the arguments raised in support of the first issue, we conclude that the issue lacks merit for the reasons previously stated. To the extent that this issue attempts to challenge the alleged overbreadth of the powers given to the receiver, aside from Mark's contentions about community and separate property, the issue is inadequately briefed. *See* TEX. R. APP. P. 38.1(i) (stating that appellant's brief must contain "clear and concise argument for contentions made, with appropriate citations to authorities and to the record"). We overrule this issue.

## Conclusion

We affirm the trial court's February 8, 2023 order appointing a receiver in this case.


Peter Kelly
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.